IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **NORTH MISSISSIPPI MEDICAL CENTER, INC.**, <br><br> *Plaintiff*, <br><br> v. <br><br> **QUARTIZ TECHNOLOGIES,** *d/b/a* **VALUE ASCENT INC.**, <br><br> *Defendant*. | CAUSE NO. 1:23-CV-3-CWR-LGI |

**ORDER**

Before the Court are the Defendant's *Motion for Preliminary Injunction*, Docket No. 60, and *Emergency Motion for Temporary Restraining Order and Expedited Hearing*, Docket No. 84. After full briefing, the Court conducted a two-day evidentiary hearing on the motions. *See* Minute Entries dated July 14, 2023, and July 21, 2023. Having reviewed the evidence, arguments, and applicable law, the Court now concludes that the motions should be **DENIED**.

**I.   Factual and Procedural History**

In August 2018, North Mississippi Medical Center, Inc. ("NMMC") entered into a Master Services Agreement with Quartiz Technologies to configure and manage a cloud-based database for three years. Docket No. 60-1. Prior to that Agreement, NMMC used the commercial software PeopleSoft to perform many of its core data functions. Docket No. 9 at 4. The Agreement transferred most of NMMC's data management needs to Quartiz. In particular, the Agreement provided that Quartiz would move NMMC's PeopleSoft database

to the cloud, configure the database for optimal functionality, and manage the data for the duration of the contract term. Docket No. 60-1.

Everyone agrees that Quartiz did all those things successfully for the duration of the contract. Docket No. 123 at 15. But at some point in the late summer or early fall of 2021, NMMC sought to bring its data hosting and management services back in-house. Docket No. 123 at 139-40; Docket No. 123 at 93. Quartiz objected. Eldo Mathew, one of Quartiz's founders and its lead on the NMMC contract, explained to Larry Flippo, NMMC's then-Director of Business Applications, that moving the services in-house was not what they had agreed upon, and that the parties would need to "revisit that decision later." Docket No. 123 at 141. No such follow-up appears in the record.

In the spring of 2022, however, NMMC began taking steps to move its data functions in-house and integrate the system with its larger electronic medical records system, which it calls EPIC. The parties disagree about the sequence of events, but the record provides a few hard dates. For example, the record shows that NMMC entered into a Master Services Agreement with a Massachusetts company called SpearMC Consulting, Inc., on March 18, 2022. *See* Docket No. 118, D-10. A couple of months later, on May 20, 2022, NMMC and SpearMC entered their first Statement of Work, which specified that SpearMC would provide Amazon Web Services ("AWS") migration services, among other things. *Id*.

Around the same time, emails between Daphne Clement, NMMC's IT Business Manager, and Mathew show that NMMC requested a full database backup from Quartiz on Friday, May 13, 2022. *See* Docket No. 118, D-7. Quartiz provided that backup five days later. *Id*.

2

The parties spar over whether NMMC requested the database backup with the intent of sharing it with SpearMC or whether it was solely for "security and auditing," as Clement averred in her May 13th email. *Id.* (Clement wrote, "[w]e are working with Security and Auditing and need [a database export data dump or database export] to be provided to us to be kept on-site"). Regardless of the reason for the request, though, no party disputes that NMMC provided SpearMC with access to the database backup shortly after NMMC received it from Quartiz. SpearMC has been using the database backup to complete its work on NMMC's EPIC migration ever since. Docket No. 123 at 62.

Quartiz now wants to stop NMMC from using the database backup. In its motion for preliminary injunction, Quartiz seeks to have NMMC return the database backup and destroy any copies NMMC may have made. *See* Docket No. 61. The motion for a temporary restraining order is somewhat narrower; it seeks to have NMMC discontinue its use of the database backup, including in the EPIC system. *See* Docket No. 85. Quartiz alleges that the database backup contains its intellectual property, and that NMMC's continued use of the backup is a violation of the "Ownership & Use of Deliverables" provision of the parties' Agreement.

That provision addressed the intellectual property rights of the contracting parties. By its terms, it expressly protected NMMC's "sole ownership of all Intellectual Property Rights in connection with any original material it provides to [Quartiz] for use within a Deliverable," and gave NMMC "a perpetual, non-exclusive and non-transferable license to use, copy, reproduce, display, or distribute the Deliverable." Docket No. 60-1 at 2. But it also explained that "each party [would] retain exclusive interest in and ownership of its Intellectual Property

3

developed before the execution of th[e] agreement and outside the scope of th[e] agreement."
*Id*.

The parties disagree about the meaning of the "exclusive interest" clause of the provision. NMMC says the clause does not prohibit its use of the database backup. *See* Docket No. 85. For that reason, NMMC argues, the Court could resolve the present motions and NMMC's motion to dismiss, Docket No. 100, in one fell swoop. *See* Docket No. 68 at 1 ("not only should Quartiz's Motion be denied, but its claims should be dismissed"); *see also* Docket No. 92 at 1. The Court declines NMMC's invitation. This Order resolves only Quartiz's motions for preliminary injunction and for a temporary restraining order; the motion to dismiss will be handled separately.

## II. Legal Standard

The familiar preliminary injunction standard applies.

> To be entitled to a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252–53 (5th Cir. 2009) (quotation marks and citations omitted). Because "[a] preliminary injunction is an 'extraordinary remedy,'" *Texans for Free Enterprise v. Texas Ethics Commission*, 732 F.3d 535, 536 (5th Cir. 2013), it "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water Ass'n,* 577 F.3d at 253 (citation omitted). Failure to establish any one of the four factors defeats the right to injunction. *See Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990).

4

The same standard applies for temporary restraining orders. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

**III. Discussion**

The Court assumes for present purposes that the third and fourth elements of the preliminary injunction standard are satisfied: The alleged injuries outweigh the threatened harm to the Plaintiffs, and it is in the public interest to halt theft of potentially proprietary information.

That said, at this stage in the litigation, the Court is unable to conclude that Quartiz is substantially likely to succeed on the merits of its claims, and Quartiz has not shown that it would suffer an irreparable injury in the absence of an injunction.

*A.  Quartiz Has Not Shown that it is Substantially Likely to Prevail on the Merits*

To show a likelihood of success on the merits for preliminary injunction purposes, Quartiz "is not required to prove [its] entitlement to summary judgment," but must at least present a prima facie case showing entitlement to relief. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). In other words, "[c]ertainty of success is not the standard—substantial likelihood is, which means that success on the merits must be 'considerably more likely' than not." *Texas Voters Alliance v. Dallas County*, 495 F. Supp. 3d 441, 457–58 (E.D. Tex. 2020) (citing *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003)). To determine whether a movant has made the requisite showing, courts look to the standards provided by the applicable substantive law. *See Sepulvado v. Jindal*, 729 F.3d 413, 418 (5th Cir. 2013).

In this case, Quartiz has asserted six counterclaims: breach of contract, conversion, liability per se, breach of the duty of good faith and fair dealing, and violations of the federal

5

and state uniform trade secrets acts. *See, e.g.,* Docket No. 61 at 17–22; Docket No. 85 at 19–24. As Quartiz explains it, the "bulk" of its claims "arise from the fact that the database backup in question contains intellectual property belonging to it and others" and that such intellectual property is "subject to copyright protection." Docket No. 61 at 11. Quartiz believes that NMMC has no right to possess or use the database (or the embedded intellectual property) beyond what is provided for in the Agreement.

NMMC responds that it had a license to use the backup database under the terms of the Agreement. *See, e.g.*, Docket No. 68 at 7–14; Docket No. 93 at 11–17. Specifically, NMMC points to paragraph 10 of the Agreement, which provides NMMC with "a perpetual, non-exclusive and non-transferable license to use, copy, reproduce, display, or distribute the Deliverable." Docket No. 60-1 at 2.

Whether NMMC has a license to possess and/or use the database backup is central to the resolution of Quartiz's counterclaims: if NMMC has a license, it has neither breached the contract, converted Quartiz's intellectual property, nor misappropriated Quartiz's alleged trade secrets. Such a finding would be fatal to Quartiz's counterclaims. That is why Quartiz argues that NMMC has no such license. *See* Docket No. 105 at 8–15.

At this juncture, however, Quartiz has not shown that it is *substantially* likely that NMMC lacked a license. Indeed, the plain language of the Agreement provides NMMC with "a perpetual, non-exclusive and non-transferable license to use . . . the Deliverable."[1] The best explanation Quartiz could muster for this language is that "the license to use that service . . .

---

[1] Quartiz does not agree that the database backup is properly considered a "Deliverable" under the terms of the Agreement. Docket No. 105 at 8. Here, too, however, Quartiz fails to carry its burden. Quartiz says it provided the database backup solely and exclusively to allow NMMC to meet its security and auditing obligations, but fails to identify a provision of the Agreement that limits NMMC use of the database backup to that purpose.

6

will no longer be valid" when NMMC "stops paying [Quartiz] or there is delinquency." Docket No. 123 at 230–31. But that is not what "perpetual" means. At the time the parties entered the Agreement, dictionaries defined "perpetual" as "continuing forever" or "unlimited in respect of time." *See, e.g.*, *Merriam-Webster's Dictionary* (2020) ("continuing forever"); *Black's Law Dictionary* (11th ed. 2019) ("unlimited in respect of time").

Quartiz asserts that a different clause of the Agreement changes the ordinary meaning of the word "perpetual." The "exclusive interest" clause, which follows the perpetual license clause in the same paragraph, guarantees that "[e]ach party will retain exclusive interest in and ownership of its Intellectual Property developed before the execution of th[e] agreement and outside the scope of th[e] agreement." Docket No. 60-1 at 2. While that clause certainly reserves each party's interest and ownership rights in their respective intellectual properties, Quartiz has not satisfactorily shown how it negates the perpetual license clause that immediately precedes it.[2]

In any event, the Court need not (and does not) decide the licensing issue today. It is enough that Quartiz has not demonstrated a "substantial" likelihood of success on the merits to be entitled to a preliminary injunction or temporary restraining order.

### B. Quartiz Has Not Shown Irreparable Injury

Under the second prong of the preliminary injunction analysis, Quartiz must show that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The Fifth Circuit has defined irreparable harm to mean

---

[2] The Court is also mindful of the fact that Quartiz drafted the Agreement. Docket No. 123 at 185, 233. And under Mississippi law, any ambiguities are construed against the drafting party. *See Wade v. Selby*, 722 So.2d 698, 701 (Miss. 1998).

"harm for which there is no adequate remedy at law," such as monetary damages. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary damages.").

Here, Quartiz has an adequate remedy at law: those monetary damages it might prove up during the remainder of this suit. The evidentiary hearing on this motion confirmed that money damages could be calculated relatively easily. While Mathew explained that his company has not placed monetary values on the alleged intellectual property, he did not aver that the information was so valuable as to be incalculable. Indeed, his testimony revealed that the value of the intellectual property Quartiz used in the NMMC project could be determined by comparing similar services offered by Oracle, the owner of the PeopleSoft platform. *See* Docket No. 123 at 194-95. The fact that adequate compensatory relief will be available later weighs heavily against a claim of irreparable harm. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).

Quartiz disputes that monetary damages are sufficient to cover its injuries. Because NMMC has shared the database backup with SpearMC—a third party and a "direct competitor" of Quartiz—"[t]his is more kind of an existential question," Quartiz argues. Docket No. 124 at 122. But the Court doubts that the threat is as existential as Quartiz contends. After all, Mr. Mathew himself testified that much of the code used in the NMMC project does not even belong to Quartiz. *See* Docket No. 123 at 209–10. Quartiz does not, he explained, have written agreements with any of the other owners of the intellectual property to work exclusively with Quartiz, and "all of them have other possible PeopleSoft projects." *Id*. In other words, any of these individuals could divulge what Quartiz claims is its

intellectual property at any time and without any recourse, apparently. That discounts Quartiz's assertion of an existential threat.

Perhaps more importantly, though, Quartiz's first presentation of its existential harm theory of irreparable harm was in closing argument. It has not offered any competent evidence to show that it would succumb to this existential threat absent an injunction. Without such evidence, the Court must find that Quartiz's assertions are merely speculative and fall short of the showing necessary to justify the extraordinary remedy they seek. *See Daniels Health Scis., L.L.C.*, 710 F.3d at 585 ("[S]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.").

## IV.   Conclusion

Because Quartiz has failed to establish a substantial likelihood of success on the merits and irreparable harm, it's motions for preliminary injunction and for a temporary restraining order are **DENIED**.

**SO ORDERED**, this the 9th day of August, 2023.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE